**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

E.H., a minor, by her mother Lisa Hayes,   )
      Plaintiff,   )
  )
     v.   )      CAUSE NO.: 4:16-CV-39-PRC
  )
NANCY A. BERRYHILL,   )
Acting Commissioner of the   )
Social Security Administration,   )
      Defendant.   )

**OPINION AND ORDER**

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff E.H., a minor, by her mother next friend, Lisa Hayes, on May 12, 2016, and a Plaintiff's Brief in Support of Her Request for Review and Remand of the Commissioner of Social Security's Final Decision [DE 17], filed on October 13, 2016. Plaintiff requests that the February 2, 2015 decision of the Administrative Law Judge denying her claim for supplemental security income be reversed and remanded for further proceedings. On November 28, 2016, the Commissioner filed a response, and Plaintiff filed a reply on December 12, 2016. For the following reasons, the Court grants Plaintiff's request for remand.

**PROCEDURAL BACKGROUND**

Plaintiff, through her mother, as she is a minor, filed an application for supplemental security income on February 20, 2013, alleging an onset date of April 1, 2007. Her claim was denied initially and upon reconsideration. Plaintiff timely requested a hearing, which was held by video on January 8, 2015. Plaintiff's mother testified at the hearing, but Plaintiff was not present because she was in the hospital being treated for a urinary tract infection. On February 2, 2015, Administrative Law

Judge ("ALJ") George Michael Gaffaney issued a written decision denying benefits, making the

following findings:

1.  The claimant was born [in 2005]. Therefore, she was a school-age child on February 20, 2013, the date the application was filed, and is currently a school-age child.

2.  The claimant has not engaged in substantial gainful activity since February 20, 2013, the application date.

3.  The claimant had the following severe impairment: Attention Deficit Hyperactivity Disorder (ADHD).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

    The claimant has less than marked limitation in acquiring and using information.

    The claimant has less than marked limitation in attending and completing tasks.

    The claimant has less than marked limitation in interacting and relating with others.

    The claimant has no limitation in moving about and manipulating objects.

    The claimant has less than marked limitation in the ability to care for herself.

    The claimant has less than marked limitation in health and physical well-being.

6.  The claimant has not been disabled, as defined in the Social Security Act, since February 20, 2013, the date the application was filed.

(AR 14-23).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## DISABILITY STANDARD

For an individual under the age of 18 years, the Social Security Act and regulations apply a sequential three-step inquiry to determine whether the claimant is disabled and entitled to benefits. The steps are: (1) Is the child engaged in substantial gainful activity? If yes, the child is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the child have a severe impairment, that is, one that causes more than minimal functional limitations? If no, the child is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Does the impairment meet, equal, or functionally equal an impairment listed in the social security regulations? If no, the child is not disabled, and the claim is denied; if yes, the child is considered disabled. 20 C.F.R. § 416.924.

At step three, if the child does not meet or equal a Listing, eligibility for benefits may nevertheless be found based on "functional equivalence." 20 C.F.R. § 416.926a ("Functional equivalence for children"). To determine functional equivalence, the ALJ rates the child's degree of limitation as either "no limitation," "less than marked," "marked," or "extreme" in the following six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3)

interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A finding of "marked" limitation in two domains or an "extreme" limitation in one domain results in a finding of disability. 20 C.F.R. § 416.926a(a), (d). A "marked" limitation is found when the child's "impairment(s) interferes seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme." *Id*.

In making the findings, the ALJ considers the child's functioning in her activities, which includes everything she does at home, at school, and in the community. 20 C.F.R. § 416.926a(b)(1). For functional equivalence, the child's functioning is not compared to the requirements of any specific Listing. 20 C.F.R. § 416.926a(d).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

**ANALYSIS**

Plaintiff seeks reversal and remand for further proceedings, arguing that the ALJ erred by not considering Plaintiff's impairment of failure to thrive at step two, by finding that Plaintiff does not meet or equal Listing 112.11, by finding that Plaintiff's conditions do not functionally equal a listed impairment, and by failing to conduct a proper credibility determination. Plaintiff also argues that the Appeals Council failed to consider new and material evidence. The common theme through all of Plaintiff's arguments is that the ALJ selectively viewed Plaintiff's condition and the medical evidence of record, rendering the decision insufficiently articulated.

1.     *Severe Impairments—Failure to Thrive*

Plaintiff argues that the ALJ erred by failing to address her "failure to thrive" at step two. Plaintiff contends that the ALJ selectively cited findings from January 2014, March 2014, July 2014, and September 2014, which reported that Plaintiff's mother and some providers were pleased with Plaintiff's height and weight gain. (AR 15). Indeed, the ALJ failed to note that, from January 2012, through October 2014, Plaintiff was consistently at or below the third percentile for height and weight, except in August 2014, when she was in the fourth percentile (but then returned to the third percentile two weeks later). *See* (AR 248-49, 256, 286, 310, 328, 350, 352, 594, 615, 619, 623, 644, 648, 651, 653, 666, 768). The only time the ALJ mentions "failure to thrive" is in passing while addressing the sixth domain of child functioning, stating "she has some growth delay, but in the last two years, her mother and physicians have been pleased with her weight gain." (AR 23). Plaintiff argues that the two years' worth of treatment records is substantial evidence of Plaintiff's failure to thrive that the ALJ ignored. The Court agrees. The selective reference to four records in which

Plaintiff's mother and/or her physician was pleased that Plaintiff had gained some weight does not change the overall and ongoing severity of her lack of growth.

Plaintiff treated with the urology and nutrition departments at Riley Children's Hospital in Indianapolis. A practitioner at Indiana University Health North wrote a letter on October 9, 2012, indicating that Plaintiff is a patient who is "followed for constipation and poor growth." (AR 248). In that note, the provider noted that in April 2012, she was in the third percentile, which was an improvement from February 2012 when she was less than the third percentile, but then she had lost weight again by September 18, 2012, possibly due to her ADHD medication, and was again under the third percentile. *Id*. A letter from a different provider on March 26, 2014, indicates that Plaintiff was being seen "because of concerns for lack of expected normal growth," noting her complicated past medical history of recurring urinary tract infections, constipation, speech impairment, and a recent diagnosis of a chromosomal abnormality. (AR 652). A treatment record dated October 3, 2014, again describes Plaintiff as being treated for failure to thrive. (AR 666).

The Commissioner points to other evidence of the record—outside of the four instances of weight gain cited by the ALJ—that were not discussed by the ALJ, such as findings that Plaintiff did not have physical limitations to contradict Plaintiff's argument that she failed to thrive. But, the ALJ did not discuss that evidence or the evidence cited by Plaintiff; the ALJ did not conduct any analysis of whether Plaintiff had the severe impairment of failure to thrive. The lack of analysis is not harmless because the ALJ did not incorporate any discussion of failure to thrive later in assessing functional equivalence. *See O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016). The Commissioner, too, fails to address the records showing Plaintiff consistently at or below the third percentile for height and weight. The Court remands for the ALJ to address the medical

evidence of Plaintiff's failure to thrive both to determine if it is a severe impairment at step two and in assessing functional equivalence, if necessary.

Relatedly, Plaintiff argues that the ALJ should have considered her failure to thrive when evaluating whether she met a Listing, asserting that she comes "substantially close" to meeting Listing 105.08(B)(2). Listing 105.08 is titled "growth failure due to any digestive disorder." 105.08, 20 C.F.R. § Pt. 404, Subpt. P, App. 1. In her opening brief, Plaintiff argues that she substantially meets the elements of Listing105.08(B)(2) on the basis that it requires three BMI-for-age measurements within a consecutive twelve-month period, at least sixty days apart, of less than the third percentile. *See id*. However, as noted by the Commissioner in response, Plaintiff fails to address Listing 105.08(A), which requires "chronic nutritional deficiency present on at least two evaluations at least 60 days apart within a consecutive 12-month period documented by" either "anemia with hemoglobin less than 10.0g/dL" or "serum albumin of 3.0 g/dL or less." *Id*. Plaintiff identifies no medical findings that are equal in severity to the Section A requirements. Given the thoroughness of the factual background of Plaintiff's 68-page opening brief, it seems likely that Plaintiff would have included such objective findings if they existed. Plaintiff has not demonstrated that the ALJ erred in not considering Listing 105.08. However, in light of the ALJ's omission of any determination of whether Plaintiff's failure to thrive is a severe impairment and in light of the evidence presented by Plaintiff in support of such a finding, on remand, the ALJ is directed to consider Listing 105.08.

*2.     Listing 112.11—ADHD*[1]

To meet Listing 112.11 for Attention Deficit Hyperactivity Disorder (ADHD), a claimant with ADHD had to satisfy a two-step analysis. First, the child must produce medical evidence showing that she suffers from marked inattention, marked impulsiveness, and marked hyperactivity. Second, a child between the ages of 3 and 18 must demonstrate that the ADHD-related symptoms result in at least two of the four Paragraph (B)(2) criteria that are required under listing 12.02 (organic mental disorders), which include marked impairments in age-appropriate (1) cognitive/communicative functioning, (2) social functioning, (3) personal functioning, or (4) concentration, persistence, or pace. 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 112.02(B)(2)(a)-(d). More specifically, the criteria set forth in paragraph (B)(2) of § 112.02 are as follows:

> For children (age 3 to attainment of age 18), resulting in at least two of the following:
>
> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests . . . ; or
>
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
>
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>
> d. Marked difficulties in maintaining concentration, persistence, or pace.

---

[1] Since the ALJ's decision and the parties' briefing on this appeal, Listing 112.11 was revised, effective January 17, 2017. *See* 81 FR 66138-01, 2016 WL 5341732 (Sept. 26, 2016).

*Id.*

The regulations define "marked," when "used as a standard for measuring the degree of limitation," to mean:

> more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. When standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

Plaintiff argues that her severe impairment of ADHD meets or medically equals Listing 112.11 and that the ALJ erred by only considering the Listing in a perfunctory manner. The entirety of the ALJ's Listing analysis provides:

> The child's impairment does not meet Listing 112.11 attention deficit hyper activity disorder because she does not have marked inattention, marked impulsiveness, and marked hyperactivity along with other appropriate age-group criteria. In making this finding, consideration has been given to the claimant's mental disorder (see Sections 12.00, et seq. Mental Disorders-Adult; and 112.00, et seq., Mental Disorders-Childhood). Despite the claimant's impairments, the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

(AR 15). The ALJ provided no analysis of any of the factors. This perfunctory determination does not enable meaningful judicial review. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785-86 (7th Cir. 2003); *see also Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) ("This is the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing."); *Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012) (remanding where the ALJ's cursory Listing analysis failed to articulate rationale for denying

benefits when record supported finding in claimant's favor); *Kline ex rel. J.H.-K. v. Colvin*, No. 11 C 50376, 2014 WL 69953, *13 (N.D. Ill. Jan. 9, 2014) (citing *Brindisi ex rel. Brindisi*, 315 F.3d at 785-86; *Pena ex rel. Pena v. Barnhart*, 01 C 50455, 2002 WL 31527202, at *8-10 (N.D. Ill. Nov. 13, 2002)).

In contrast, factor-by-factor, Plaintiff identifies longitudinal evidence suggesting she satisfies each of the necessary factors to meet the Listing, which the Court outlines below. The ALJ did not discuss this evidence either in the Listing analysis or when considering functional equivalence. Nor did the Commissioner address this evidence in her response brief or explain why the ALJ did not discuss the evidence. Rather, the Commissioner argues that Plaintiff is asking the Court to reweigh the evidence; the Court disagrees. There is no indication in the decision that the ALJ considered or weighed this evidence. The ALJ's failure to consider this favorable evidence both in evaluating Listing 112.11 and later in considering functional equivalence necessitates remand.

a.    Inattention

Plaintiff has been diagnosed with ADHD and Disruptive Behavior Disorder. She was assigned a GAF score of 50 on at least 17 occasions. (AR 304, 367, 393, 421, 437, 537, 542, 547, 677-78, 682, 706, 710, 716, 719, 722, 725). A GAF score of 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. In April 2012, Plaintiff had a pending school case management session targeted to get her one-on-one aid to redirect her, as she was having trouble in school despite ADHD medication (e.g., talking back to her teacher, unable to sit still, unable to follow instructions, talking over teacher), was taking a long time to complete homework, was being defiant, refused to do what she was told, and had mood swings and tantrums. (AR 273). Similarly, on May 16, 2012, a Wabash Valley Alliance (WVA) report noted that Plaintiff

was referred for services due to disruptive behavior in the classroom, frequent talking when asked to be quiet, bothering other students when they are trying to do their work, and disobeying the teacher. In addition, the client is easily distracted, has difficulty with focus and concentration, does not complete tasks, and is quite disorganized. Client has had these behaviors since she was pre-school age.

(AR 385). This report also noted objective findings from a mental status examination showing Plaintiff had poor insight, short-term and long-term memory, and concentration. (AR 386-87).

In mid-2012, due to the severity of her condition, Plaintiff attended Camp GLOW (a program through the WVA) in an attempt to improve her interpersonal skills and better manage her ADHD and Disruptive Behavior Disorder symptoms. (AR 483-526). Mr. Lemaster noted during the mental status examination that he had a difficult time assessing Plaintiff's thought process, intelligence, mood, memory, or orientation. (AR 383). Additionally, WVA records at Camp GLOW reflected that while Plaintiff was kind and happy, she was noncompliant, inattentive, and/or uncooperative, (AR 507, 524); defiant, often refusing to use the restroom or participate in activities, (AR 501, 503, 506-08, 513-14, 518, 524-25); struggling to stay involved in one task without direct supervision and constant reminders, (AR 521); struggling with immediate compliance with instructions, (AR 501, 503, 509, 511); struggling with controlling impulses, (AR 507); struggling with social skills, (AR 486-87, 491, 497-98, 506, 509); impatient and demanding, (AR 504); manipulative, (AR 513-15); easily distracted by others, (AR 511); and lacking coping skills for her frustrations with limitations due to her kidney disease, (AR 515, 527).

In August 2012, Plaintiff continued to receive WVA intervention and her case managers continued to note that Plaintiff was self-centered, lacking coping skills, lacking social skills, lacking organizational skills, bossy, defiant (often in a quiet, unnoticeable way), struggling to follow directions or be cooperative, distracted and off-task, manipulative to adults in order to get what she

wants, pushing boundaries and limits, and that she "does not like school and does not want to go." (AR 459-65, 468, 471-74, 478). This remained true throughout 2012. (AR 436-56). Despite medication management, (AR 448), and being responsive to one-on-one intervention, (AR 453), Plaintiff continued to display hyperactivity, was defiant and stubborn, was lacking in skills to cope with her oppositional defiant disorder symptoms, was lacking in coping skills, was lacking in organizational skills, was unable to take responsibility for her actions, was manipulative, was impulsive, was distracted by peer activity, had trouble focusing in large groups, and either struggled to follow or completely refused to comply with directions or instructions. (AR 436-56).

Between January and March 2013, WVA case managers often noted that Plaintiff remained happy and talkative but also defiant and stubborn, refusing to cooperate or meet expectations. (AR 409-34). They also noted that, despite medication, Plaintiff lacked skills to remain on topic, was less focused, was more distracted and off-task, and was struggling with writing per teacher report. (AR 410-11). Ms. Davis, Plaintiff's second grade teacher, completed a Teacher Questionnaire in April 2013, noting that Plaintiff had "a very serious problem" in comprehending and following oral instruction and in understanding school and content vocabulary. (AR 206). She had a "serious problem" in virtually all other aspects of acquiring and using information, including reading and/or comprehending written materials, comprehending and doing math problems, understanding and participating in class discussions, learning new material, recalling and applying previously learned material, and applying problem solving skills in class discussions. (AR 206).

Also in April 2013, during a consultative examination at the request of the State Agency, Dr. Ascough noted that Plaintiff made no report as she was too busy leaping from chairs and somersaulting on the floor. (AR 300). Dr. Ascough observed that Plaintiff's eye contact was

intermittent and she was pleasant and happy, but frequently moving; so active it was difficult to assess motor skills; loud, with and fast voice and a clear speech difficulty; extremely distractible and only capable of redirection with novel cues; and, unable to remain on task for more than a minute without redirection. (AR 301-02). During the examination, Dr. Ascough noted that Plaintiff appeared to hear questions but simply kept moving and did not respond to them; did not know why she was there, her phone number, or her principal's name; was unable to recall three object names; could not calculate 12/3 or $1.00 minus $0.12; was unable to do Serial 3s from 20; stated she didn't know what to do if lost in a town away from home or encountered a younger child cut slightly; stated that if she was home alone during a fire she would "throw water on it or run out"; did not know similarities or differences for a foot/inch or peach/pear and hurricane/volcano; showed little ability to concentrate and attend or persist; and had poor communication skills and speech difficulty that would require continued speech therapy. (AR 302-03). Dr. Ascough's overall impression was of an extremely overactive ADHD child and was "in the top 10 in terms of activity." (AR 301-02).

During an annual WVA evaluation in mid 2013, it was noted that Plaintiff's progress over the last year was mixed, with some improvement at school, but Plaintiff was still struggling with following directions, multitasking, and staying focused and was exhibiting impulsiveness, interrupting, unable to wait her turn, poor listening, arguing about homework, and needing one-on-one attention to complete assignments. (AR 536). During this time, records from Camp GLOW documented that Plaintiff returned to continue working on her interpersonal skills, (AR 540), but remained hyperactive and manipulative, preferring to be alone, required repetition and reminder of expectations, was easily distracted by peers, and focused poorly during activities, (AR 549, 553).

WVA records from August 2013 to November 2013 show weekly visits noting that Plaintiff

"tunes out" and ignores her mother, (AR 755), is defiant with her mother and talking back more, (AR 749, 757-58), manipulating events to test her mother's control, (AR 750), losing weight but still refusing to eat or drink her nutritional shakes, (AR 753, 756-57), refuses to cooperate with dental hygiene, (AR 751), still lacks coping skills to deal with frustrations, (AR 757), and is in "constant motion" and "does not do well with more than a minute down time," (AR 748).

Genetic counselor Dr. Torres-Martinez performed an examination in January 2014 and noted that Plaintiff had demonstrated some significant issues with memory, reading comprehension, and retention of complex information, and he felt it was imperative for Plaintiff to receive necessary school assistance (including a tutor and one-to-one instructions), because if left to drift along, she would not be able to catch up with the required work, which "would bring additional problems and frustrations for her already fragile emotional development." (AR 577).

In May and June 2014, WVA providers found that, although Plaintiff was in a good mood and was on ADHD medication, her attention and concentration were very poor, she was hyperkinetic, unfocused, and exhibited unclear articulation. (AR 712). In August and September 2014, Plaintiff met with several WVA practitioners on at least ten different occasions. (AR 676-81, 686-89, 709-10, 735-41). While Plaintiff had some good days, WVA practitioners found Plaintiff during school to be fidgety (to the point of teachers removing distracting objects from her), refusing to eat during lunch, off task and distracted, and shouting during class. (AR 735-41).

All of this evidence identified by Plaintiff tends to demonstrate marked inattention and that Plaintiff's ADHD seriously interferes with her ability to maintain attention in an independent, appropriate, effective, and sustained basis. The ALJ addressed none of this evidence in determining

that Plaintiff does not have an impairment or combination of impairments that meets or medically equals Listing 112.11.

b.      Impulsiveness

Much of the above-referenced evidence also constitutes medically documented findings regarding Plaintiff's impulsiveness and is incorporated herein. In addition, in June 2011, Plaintiff was exhibiting more moodiness and aggressive behaviors, such as biting and pinching, and timeouts were not effective. (AR 282). In September 2011, Plaintiff was aggressive and defiant at times, with intermittent negative mood, impulsive, hurting herself or others, throwing tantrums, and becoming emotional. (AR 280). In October 2011, despite some improvement after medication adjustment, Plaintiff still had mood and behavioral problems at home (e.g., fighting with her mother and brother, aggressive, defiant, talking back, with inconsistent sleep and little appetite). (AR 278). In December 2011, despite medication management, Plaintiff continued to have screaming meltdowns (sometimes physical as well) in the evening and fighting with her brother and mother. (AR 277).

In April 2012, Dr. Jonkman noted that Plaintiff's diagnoses as ADHD and behavioral issues, specifically, mood swings and oppositional defiant disorder. (AR 273). A May 2012 case report noted that Plaintiff reported liking to be mean to her brother. (AR 386).

As noted above, Plaintiff attended Camp GLOW through the WVA in an attempt to improve her interpersonal skills and better manage symptoms of her ADHD and Disruptive Behavior Disorder. (AR 483-526). Despite this intervention, in February 2013, Plaintiff had developed an "I don't care" and snotty attitude, being argumentative, with declining grades. (AR 287).

Dr. Ascough's report, completed after the examination at the request of State Agency in April 2013, also notes Plaintiff's impulsiveness. Dr. Ascough noted Plaintiff's mother's reports that

there are times when Plaintiff will lead four or five other children in bad behavior "so that the teacher has a bad time with their combined negative interaction." (AR 303). Dr. Ascough noted that Plaintiff made no report because she was too busy leaping from chairs and somersaulting on the floor. (AR 300).

In spring 2013, Plaintiff's WVA providers continued to note Plaintiff's impulsiveness. It was during this time that they noted that Plaintiff remains unable to see that her behavior is hindering any progress. (AR 399). Plaintiff continued to struggle in school, being bouncy and impulsive, (AR 402), and her principal had to speak with her a few times about not completing homework and losing recess, (AR 404). In fall 2014, WVA practitioners found that, despite multiple intervention modalities, Plaintiff continued to have difficulty with social skills and making friends and at school was distracted and off task, staring at the back of the classroom, and had a hard time following along with her reading group. (AR 735-41).

This evidence, in addition to the evidence outlined in the previous section, supports Plaintiff's assertion that she has marked impulsiveness and that Plaintiff's ADHD seriously interferes with her ability to control her impulses and her ability to perform independently, appropriately, effectively, and on a sustained basis. The ALJ did not discuss this evidence when finding that Plaintiff does not meet or medically equal Listing 112.11.

c.      Hyperactivity

Much of the same evidence discussed in the two areas above also provides medically documented findings of Plaintiff's hyperactivity. Plaintiff has been repeatedly diagnosed with ADHD diagnosis with attention to Plaintiff's hyperactivity. For example, Dr. Jonkman noted that Plaintiff's ADHD was hyperactive type. (AR 278) (10/31/2011). Dr. Perkins diagnosed ADHD,

primarily hyperactivity. (AR 313) (4/11/2013). Plaintiff's pediatrician noted she was hyper at the April 2011 session. (AR 284). There are multiple references to Plaintiff's poor sleep. *See e.g.*, (AR 273, 278, 280, 536).

During an annual evaluation in mid-2013, her WVA care givers noted that Plaintiff continued to exhibit hyperactivity and oppositional and defiant behavior, aggressiveness with her brother and the family dog, and poor sleep and appetite. (AR 536). Plaintiff's Camp GLOW providers continued working on her interpersonal skills (AR 540), but she remained hyperactive and manipulative, preferring to be alone, required repetition and reminder of expectations, was easily distracted by peers, and focused poorly during activities (AR 549, 553).

This evidence, in addition to the evidence outlined in the two previous sections, supports Plaintiff's assertion that she has marked hyperactivity and that Plaintiff's ADHD seriously interferes with her ability to perform independently, appropriately, effectively, and on a sustained basis. The ALJ did not discuss this evidence when finding that Plaintiff does not meet medically equals Listing 112.11.

d.     The Four Age-Group Criteria

If marked inattention, impulsiveness, and hyperactivity have been established, the inquiry shifts to whether Plaintiff has two marked areas in the four appropriate age-group criteria identified in paragraph B(2) of Listing 112.02 (i.e., cognitive/communication functioning, social functioning, personal functioning, and concentration, persistence, or pace). Here, Plaintiff identifies evidence she argues demonstrates that she has marked limitations in all four of the appropriate age-group criteria. Much of the same evidence discussed in the three areas above also provides medically documented

findings as to Plaintiff's marked impairments in the age-group criteria. This is a highlight of the most relevant evidence that was not presented above.

1)      Limitations in Cognitive/Communication Functioning

A December 2012 Individualized Education Program noted that Plaintiff's articulation scores were two standard deviations below the mean. (AR 178). As the regulations state, "[w]hen standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C). Additionally, Plaintiff's speech providers noted that her ADHD affected her motivation for speech therapy. (AR 200-01). Moreover, Dr. Ascough noted Plaintiff's poor communication skills and speech difficulty. (AR 302-03). He further found that Plaintiff had sensory issues (corrective glasses and auditory difficulties suspected by Plaintiff's mother due to talking loudly and apparent inability to process auditory information), communication issues (continued speech difficulty despite speech therapy), likely to have specific cognitive skill deficits, and social/emotional skill problems ("well below expected for her age … her movement is such that she does not clearly observe the behavior of others and … is not learning the social and emotional responses necessary to interact."). (AR 305). An October 2014 school report also noted delays in Plaintiff's math and reading, noting that, despite being a fourth-grader, she was reading at the same level as a second-grader in the middle of the year. (AR 565). Plaintiff's mother's testimony also documents marked limitations in this domain. Despite weekly speech therapy at school since kindergarten, Plaintiff's mother testified that strangers, including Plaintiff's providers, have difficulty understanding Plaintiff, who must repeat herself often. (AR 44). This record evidence supports Plaintiff assertion that she has marked limitations in cognitive/communication functioning.

2)     Social Functioning

Plaintiff was assigned a GAF score of 50 on no less than 17 occasions. (AR 304, 367, 393, 421, 437, 537, 542, 547, 677-78, 682, 706, 710, 716, 719, 722, 725). A GAF score of 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. Her school records note significant behavioral problems. For example, Plaintiff has very few friends, (AR 367), and has a defiant attitude, *see e.g.*, (AR 273, 278, 280, 458, 470, 501, 503, 506-08, 513-14, 518, 524-25). Plaintiff attended Camp GLOW on multiple occasions through the WVA in an attempt to improve her interpersonal skills and better manage symptoms of her ADHD and Disruptive Behavior Disorder. (AR 483-526). In October 2014, WVA practitioners found that, despite multiple intervention modalities, Plaintiff continued to have difficulty with social skills and making friends. (AR 735-41).

Dr. Ascough noted Plaintiff's poor communication skills and speech difficulty. (AR 302-03). Dr. Ascough found that Plaintiff had social/emotional skill problems which were "well below expected for her age." (AR 305). Dr. Ascough noted that "her movement is such that she does not clearly observe the behavior of others and . . . is not learning the social and emotional responses necessary to interact." (AR 305).

Plaintiff's mother testified that Plaintiff's ADHD and oppositional defiant disorder give her problems at school, including social difficulties (e.g., trouble making friends, very bossy and pushy, reprimanded for chasing kids around and pinching/hitting them on the playground), (AR 35, 39), rebelling against teachers, and getting into trouble, (AR 39). Plaintiff has only one friend, who is very tolerant of Plaintiff's bossy/pushy behavior, (AR 35-36), even though Plaintiff is not respectful of her friend's toys (AR 45). Plaintiff has aggressive outbreaks with her siblings, including clawing

her brother down his back with her fingernails because he bumped into her. (AR 36). She must be punished at least a couple of times a day, generally by standing in the corner. (AR 36). Plaintiff is unable to participate in extracurricular or after school activities because of her physical contact restrictions. (AR 37).

3)     Personal Functioning

As noted above, Plaintiff was assigned a GAF score of 50 on no less than 17 occasions. Providers noted Plaintiff's refusal to eat or to cooperate with treatment, medications, dental hygiene, or nutrition. *See e.g.*, (AR 396, 399, 406, 408, 546, 751, 753, 756-57). Additionally, Dr. Ascough noted Plaintiff's mother's reports that there are times when Plaintiff will lead four or five other children in bad behavior "so that the teacher has a bad time with their combined negative interaction" and that essentially Plaintiff will do nothing for herself (including picking out clothes, dressing, showering, brushing teeth, tying shoes, taking medication without surreptitiously taking pills and crushing them into the carpet). (AR 303). Ms. Davis, Plaintiff's teacher, noted that Plaintiff has daily problems with caring for herself, such as her personal needs and medications. (AR 210). Plaintiff's mother testified that Plaintiff needs assistance in bathing and dressing herself. (AR 42-43).

4)     Maintaining Concentration, Persistence, or Pace

Much of the evidence above informs an assessment of Plaintiff's ability to maintain concentration, persistence, or pace. Again, Plaintiff was assigned a GAF score of 50 on no less than 17 occasions. In May 2012, testing through WVA showed that Plaintiff was "easily distracted, has difficulty with focus and concentration, does not complete tasks, and is quite disorganized." (AR 385). That examination showed that Plaintiff had poor insight, short-term and long-term memory,

and concentration. (AR 386-87). WVA reports continued to document that Plaintiff was easily distracted. (AR 511). In April 2013, Dr. Ascough noted that Plaintiff showed little ability to concentrate and attend or persist. (AR 302-03). WVA reports continued to document that Plaintiff was easily distracted and focused poorly during activities. (AR 549, 533). In May 2014, WVA providers noted that, although Plaintiff was in a good mood and was on her ADHD medications, her attention and concentration were very poor and she was hyperkinetic, unfocused, and exhibited unclear articulation. (AR 712). In October 2014, school testing showed that despite being a fourth-grader, she was reading at the same level as a second-grader in the middle of the year. (AR 565).

Although this evidence supports marked limitations in all four areas, Plaintiff only needed to show marked limitations in two of the four age-appropriate criteria. The ALJ's conclusory statement does not indicate that he considered any of this evidence in determining whether Plaintiff's condition meets Listing 112.11.

In *Griffin v. Colvin*, No. 15 C 2512, 2016 WL 910506, at *7 (N.D. Ill. Mar. 10, 2016), the ALJ's Listing analysis was perfunctory but, when the decision was read as a whole, the Court found that the ALJ "thoroughly compiled all the evidence and provided adequate analysis of it in reference to the relevant issues under Listing 112.11." In this case, the ALJ likewise considered record medical evidence in the context of evaluating functional equivalence; however, the ALJ repeatedly discusses only the evidence that supports his findings and does not acknowledge or discuss the substantial records set out above and identified by Plaintiff demonstrating greater limitations. To read the facts contained in the ALJ's decision and those recited above could lead one to think two different children were being discussed. Remand is required because the ALJ failed to provide a

meaningful analysis of the record evidence in deciding whether Plaintiff's ADHD meets or medically equals Listing 112.11. If necessary, the ALJ may also require an updated medical judgment as to medical equivalence that considers all of these records.

3.      *Other Issues*

Plaintiff argues on this appeal that the ALJ failed to consider the record evidence that supports a finding that she functionally equaled a listed impairment by finding that she had less than a marked impairment in five of the six categories and no impairment in the sixth. As with the analysis of Listing 112.11, the ALJ primarily considered the evidence that supported his findings without considering the body of evidence favorable to Plaintiff above. On remand, should the ALJ engage in a determination of functional equivalence, the ALJ is directed to consider this relevant, favorable body of evidence. On remand, the ALJ will have an opportunity to reevalute Plaintiff's subjective statements under SSR 16-3p, which became effective after the date of the original decision that relied on SSR 96-7p for the credibility analysis. And, the ALJ will have an opportunity to consider the evidence that was presented for the first time to the Appeals Council.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of Her Request for Review and Remand of the Commissioner of Social Security's Final Decision [DE 17], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 29th day of September, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT